May it please the court, I would like to address three issues in my time. The first issue, which is the easiest one I submit to separate out, is that Claim 11 should not have been included in the judgment. It was swept in with said data, but the relevant term is image and the image. It is a different term. The visual image is different from the numerical information of the data. It also was not amended. There should not be any stoppa. There was no basis for an action to stop it, as the court has previously stated in the Glaxo case. I submit that the information is completely different. The court swept the image of Claim 11 into the court's rulings below, when in fact there was no basis for doing that. The information is entirely different. The patent teaches that, and I'll come to this later as well, no, Claim 11 was not amended in the sense of adding said data. That image was already in the claim. But the references to data were in, right? Not to Claim 11. Claim 11 is completely different. That does not emerge clearly from the judge's decision, and the Kodak brief doesn't address it. It just groups the claims together. All the other claims had said data either originally in the claim or added to the claim. Claim 11 deals with image and the image, and that's what's gotten lost here. Claim 11 should be considered separately. But that's just about one of the limitations of Claim 11. Some of the other limitations were amended, which is my understanding. They were not the basis for the court's decision. I understand that, but when you say that Claim 11 wasn't amended, that's not accurate. There were other amendments. This language that you're relying on in Claim 11 wasn't amended, but other parts of Claim 11 were amended, right? Yes, sir. Other portions were amended, but they were not part of the court's consideration because they didn't go to the issue of what it is that appears in the random access memory, what it is that appears in the bulk memory, and how they're related. Other amendments didn't have anything to do with that. That's only the issue of image being in the random access memory, the image being in the bulk memory, and no amendment having been made in that claim to narrow that relationship. But there were amendments to that claim made that add to the data about the crisis. I don't have that in mind, but not as it affects this issue. It doesn't have anything to do with it. Well, you say it doesn't affect this issue, but maybe it does in the sense that we did have efforts to conform Claim 11 to solve the problems that the examiner was concerned that some amendments were made to Claim 11, but that this particular language that you're directing yourself to wasn't amended perhaps because of oversight. But I don't see the notion that Claim 11 was exempt in the examiner's concern. In fact, my recollection of the prosecution history is that he did say he was concerned about Claim 11. I believe it's true that the examiner had a number of 112-type concerns with all of the claims. But insofar as the relationship between what it is that was in the random access memory and what it was in the bulk storage, I do not believe that any amendment was made there, that the language that governs that relationship remained the same and was not amended. The other amendments that the examiner provoked because of 112 concerns went to other issues but did not relate to the relationship between the image information that was in the random access memory and the image information that was in the bulk storage. And that's why I submit that Claim 11 is different both as to claim construction for literal infringement purposes as well as whether there's an infectious estoppel for purposes of the doctrine of equivalence. There shouldn't be any infectious estoppel anyway because the claim language is different. And under the guidance of Glaxo, the said data limitations shouldn't apply to image. But there was no amendment anyway within Claim 11. Any amendments that were made to Claim 11 with respect to random access memory make clear that the data that go there was the same data that came from the source. I don't think they did, Your Honor. No. By the way, storing reduced video pixel data is not a reference to the random access memory. It says conditional storage locations instead of random access memory along with the video pixel data. So when we're talking about storage in the random access memory, we're talking about storage of the earlier received data, just as we are in other claims. You're relying on a somewhat different language with respect to the storage in the bulk memory, if I understand correctly. Your Honor, I guess I would address you to appendix page 11670, where it shows the original language and the amended language. And I submit to Your Honor that that language would show that what the court was addressing in terms of the relationship between what's in the random access memory and the bulk storage was already in the claim that's filed. It wasn't amended. Well, do you agree that the data in the random access memory had to be the same data that was amended with the source? No, Your Honor, I don't. You don't. No. I submit to Your Honor that that's another issue that's gotten lost here, that the patent teaches, and this applies to other issues. In this instance, if I could ask Your Honor to turn to page A115 in the record, which is the relevant language of the patent, the court noted the YCC data that was created and did not note the very next sentence, which starts at column 3, line 24. And those five lines talk about a concept of chrominance data having half the spatial resolution. That was explained in turn by one of the experts, Bonsalot. Bonsalot's explanation appears at page A8156 of the record, starting at paragraph 44 for later reference. And it's undisputed that the language of half the spatial resolution refers to something called chrominance subsampling. Half of the pixel information is just discarded. The patent in this particular preferred embodiment tells you that one way you can do this is throw away half the information because you don't need it to preserve the image that's part of the image processing that's provided for by this patent. Counsel, is that language relevant to the image in Claim 11, or is that relevant to the video pixel data discussion? I actually think it's... I thought it was the video pixel data discussion. That's where I was going to go to it, but I think it applies to both. Okay, well, before we go there, so to the extent that it's relevant to the video pixel data discussion, that is the claim element that you would acknowledge was modified during prosecution. You say clarified. Not in a narrowing way, yes. Well, so that was the modified. So if I disagree with you and find that it was narrowing, don't we have precedent that says even though disclosures in spec might be broader if there are narrowing amendments made in the prosecution, it's okay to exclude even the preferred embodiment? Because one of your consistent arguments is that you can't have a claim construction that excludes a preferred embodiment, and that's rarely, if ever, correct. Well... But one of the times in which we found it to be correct... That's the Dow case. The prosecution history establishes more into it, right? Is that a correct assessment of our precedent? That's a possibility if there's a prosecution history established, certainly, but the Dow Sumitomo case, I think, is the best case from our point of view that ordinarily you shouldn't be construing claims in a way that would exclude the preferred embodiment. There are lots of cases that say it's rarely, if ever, corrected, and I don't disagree with you on that characterization of our precedent, but one of the cases that fall into the rarely category in our case law has said is when prosecution history has forced the patentee to take something narrower than what they originally were hoping to get. Then you can be stuck. No question. Okay. But I would submit to Your Honor on that score as my second point, that number one, if you look, for example, at appendix page 1146, where the original and amended versions of Claim 7 were shown, you can find in the original version of the claim language the court did not consider, which shows that the concept of transferring the data for the full-sized image from RAM to the bulk storage was already elsewhere in the claim. And I can point, Your Honor, to a couple of instances of that. But didn't the examiner assume that that wasn't the case, that it wasn't presented that way in the original claims, and that's why you required the amendments? If you ask me, Your Honor, I would submit that what the examiner was doing was requiring that the formalities in the Patent Office be observed, that there was an antecedent relationship. Where do you say that the claims already had an antecedent relationship? He didn't say one way or the other. He just said that it wasn't specified, and he said it should be dealt with in the matter of 112. Aren't we supposed to assume that an amendment is narrowing if it's not clear? I submit, Your Honor, it is clear. The prosecution history shows that the objective purpose is discernible from the prosecution history. The part of the applicant was to clarify. There was no prior... That's my problem. How do I know that? I mean, you just agreed with me that the examiner didn't say that. He didn't say the opposite. So where is it in the prosecution history that we find that it was just a clarification? I submit that you find it from the original claim language, the amended claim language. The original claim language shows that that data transfer was already there in other limitations of the claim. It's also consistent with the specification, which only shows the one modality of transferring the entire information for the image from the random access memory to the bulk storage memory. That's in column four, starting at line 16, where it says that's what happens, and it's the only thing. So that if you read the entirety of the claim in light of the specification, along with the prosecution history, the only conclusion I submit you can come to is that it was clarifying the formal relationship. I'm sorry. Go ahead. You keep talking to us about the language of the claim that was there before and the language of the claim after, but I'd like to turn your attention to the language the examiner used in his rejection. Yes. Which is on your page, page 3169, his rejection, the relevant one here. At line 27, he says, video pixel data is indefinite. Boy, that doesn't sound like a modality to me, does it? Would you say when an examiner characterizes something as indefinite, that's his recognition that he's just making you add the word does, a matter of formality? Because it is not clear if it refers back to the pixel data, and he wanted clarification as to whether or not it referred back. That required the insertion of the word said in accordance with patent office practice. So you had to include this word, because otherwise your claim was indefinite. According to the examiner. Right. Now, doesn't Besto's Supreme Court case make clear that amendments made to overcome a 112 rejection are, in fact, the kinds of amendments to what prosecution is to establish? Not are, can be. It doesn't say that they are. I know of no case that says that all such amendments are narrowing, and there are cases like Boe's, for example, that says you need to look at what actually happened to determine whether, in fact, it was narrowing. If it's only making clear what was implicit because of the other content of the claim, it is not narrowing, and Besto does not say that all amendments for 112 purposes are narrowing. So your theory is that any time there's an amendment to overcome an indefinite rejection, which is in the way of clarification, it's not subject to prosecution, it's based on? Not necessarily. You have to look at the entirety of the record, including the prosecution and the claim, and When does it, and when doesn't it? It strikes me that you're arguing that the thing to be characterized as a clarification, that there was an antecedent basis, that an indefinite rejection does not lead to prosecution history estoppel. Tell me in what circumstances it does, if there's an argument that the claim included the limitation before. If the claim included the limitation before, then it is not a prosecution history estoppel because it is clarifying. It's not narrowing. Even though it's to overcome indefinite. Yes, because it is not narrowing, and that's what the inquiry needs to be. It's clarifying. The information is already elsewhere in the claim. It is clear to a person who looks at the record, who looks at the claim language as it already existed, that what would otherwise be limiting is already in the claim. But if it was clear, you wouldn't have had an indefinite misrejection in the first place, right? I don't think that's correct, Your Honor. I think in this case, because the word said was not there as a formal matter, that limitation was left indefinite, and the examiner had every right to say, I want you to clarify that antecedent relationship. Otherwise, it's indefinite without that clarification. But that doesn't mean the rest of the claim doesn't show the limitation is already present. The examiner's got the right to say, in this limitation, put the word said. Do what you have to do to correct that antecedent relationship. That doesn't mean that the relationship isn't shown elsewhere in the claim. In the Bose case, there was this concept of an ellipse that had a major axis, and part of that was already in the claim. They added, I forget whether they added the ellipse or added the major axis, they added one of them, which could be deemed as being narrowing because it wasn't there before. But because the other information was already in the claim, it was not narrowing. It simply made clear what was already inherent. That is the case here. If you read the rest of the claim language and confirm it by what the spec says in column four, there's only one way to view this. The rest of the claim shows that the information being transferred from the random access memory to the bulk storage is the information for the full-size image. There's no other way to interpret that because two other claim languages. Alright, thank you, Ron. Thank you. We need a few extra minutes to get here. Thank you. Counsel, could you start with the same question, the same issue that Mr. Jenner started with, which is the Claim 11 language about the image was not modified during the prosecution history of Stottley, so the doctorate of equivalent should still be back on the table for them at least with regards to that. Yes, sir. As Judge Dyke indicated to Mr. Jenner, Claim 11 was in fact amended during the prosecution. Now, it was amended to add the word full to the random access memory limitation, and it was amended to add the word image to the bulk store limitation, and it was added to add video pixel data to the prior random access memory limitation. Critically, when it was amended, what Antos said was that it was amending the claim to bring it in line with the other claims. In other words, to correct similar antecedent problems that the examiner had had with the other claims. So that's number one. It does seem a little odd, doesn't it, that they didn't do more to the language of dealing with soft storage. It seems at best to be an oversight that similar language about read data or set data or whatever wasn't imported into that claim limitation. They have the word image instead of data, image data. Well, Your Honor, we're not saying that the amendments to Claim 11 created the estoppel. What we're saying is that the amendments to Claim 11 brought it in line. I understand, but that line of cases requires that you have the same language already present in the other claims that are subject to the estoppel. And here, our problem is that we don't have exactly the same language. We have a reference here to image rather than the set data or read data or whatever. So it's a bit of an expansion of those cases to say that we're going to take the word image and say that it gives rise to the same estoppel as the word read data or set data. Well, Your Honor, there are a number of answers to that. The first is that the builder's concrete case that we rely on in our brief suggests that you don't need precisely the same claim language for the infectious estoppel to apply. What you need is a limitation that covers the same subject matter. And in the builder's concrete case, the terms were transverse utility passage in one claim and passage extending between a trench and a deck in another claim. And because the court found that those, although slightly different, were described and covered the same subject matter, it held that the infectious estoppel rule applied. So that's number one. Number two is looking at the claim language in Claim 11. And that is on A1. I would have thought the test was whether the language we're dealing with has the same meaning, even though it's different, has the same meaning for purposes of literal infringement. And if you conclude that it has the same meaning for purposes of literal infringement, then it's okay to go on and find infectious estoppel. So the real question here is should this language be given, the image language, of storage limitation be given the same meaning as the set data limitation here in another claim? Your Honor, I think that's exactly right. And I think in this case the language does create the same limitation. And the reason for that is as follows. If you look at A117, that is Claim 11, the claim recites a method of storing video pixel data. So we know up front what we're storing is video pixel data. The first limitation is the random access memory limitation. And what's stored in random access memory is full video pixel data comprising a full-size image. Then if you jump down to the bulk store limitation, which is in column 8 at line 9, it says storing both the full-size image and the reduced-size image. What the antecedent basis for the full-size image is full video pixel data comprising a full-size image in the random access memory limitation. The third point is that as you walk through the- Okay, but I don't get how that makes it the same. I'm sorry, I just don't get your linkage. So you need to walk me through it. Okay. Well, the antecedent basis for the full-size image- Well, it is a full-size image used above, but a full video pixel data comprising means the video pixel data can have a full-size image and other things in it. So the problem I'm having with your analogy is the video pixel data can have more than just a full-size image. Right. I think there's two points, Your Honor. One is that when you store an image, technically, and as Apex's experts have acknowledged, all you can store is the data for that image. When you're storing an image on an electronic system, all you can store is the data for that image. So that's number one. Number two is that in the preamble, it makes clear that what we're talking about here is storing video pixel data. So when it refers to storing the image in the bulk store memory, by definition, it's referring to storing the data that makes up that image. And the third point is if you walk through this claim, the claim uses the terms image and video pixel data interchangeably. If you look at the limitation prior to the bulk store limitation, it refers to the full video pixel data. So that's referring to storing the reduced video pixel data in the random access memory along with the full video pixel data. And then in the very next limitation, it says storing the full-size image. So it's switching back and forth between full-size image and full video pixel data. And when Ampex – the examiner rejected this claim for the same 112.2 Latinx student basis problems. And when Ampex corrected, Ampex said it was bringing this claim into line with the rest of the claim system. The third point is – I'm trying to understand this. Is your point that the amendments to the random access memory claim limitation made clear that the stored data there was the same as the generated data from the earlier claim limitation and that there's no indication that in going from random access memory to bulk memory, that there was supposed to be any processing to it? Well, there's two points here, Your Honor. One is that the amendments that they made made the element in the bulk store correspond precisely to the element that we have in random access memory. By adding image to the bulk store limitation and full to the random access memory, it's not a felicitous use of work. That's why we're here in having a problem. It may be clear that in the random access memory, the generated data has to be stored in the same way without processing. But then there's this use of different languages in the bulk storage limitation from the image instead of data, which is a little confusing. I mean, I've got to have that stuff. Well, I think the other place to look is in the specification. And there are two critical points in the specification that indicate that the data between RAM and the disk store in this invention was not to be modified. The first is that what the specification describes and what the claims describe is a specific architecture for the storage of full and reduced size images. And it was an architecture for the context of television broadcasts in 1983. And the way these electronic still stores were used is that they would hold a frame of video feed, store it, and then they wanted to rapidly recall it and place it over Walter Cronkite's shoulder on a news broadcast. And so there were two key pieces to the invention. One is that they wanted to retrieve the same image that they had stored so that they could faithfully represent that on the news. And, in fact, Ampex's expert agreed that the whole concept of a still store is to input the image data and output it in the same manner. The second piece is that they wanted to do it without processing between disk and RAM because processing took time. It caused delays. And in the background of the invention section of the patent, this is at A114 lines 44 to 49, refers to the 264 patent, the priority patent, and it criticizes on-the-fly processing. Now, consistent with that criticism of processing, the specification describes the transfer of digital data between RAM and bulk store without any processing. It's undisputed that— Now, where does it say that? The transfer from RAM to bulk store without any processing. Well, the specification never indicates—the specification does talk about processing, but none of the processing that it refers to happens between disk and RAM. In other words, if you look at the portion of the specification that Mr. Jenner referred to in column 3, line 26, it refers to the fact that data is produced after the analog-to-digital conversion. And after that data is produced, and as it's transferred from RAM to disk and back to RAM, it's undisputed that there's no processing. The criticism of the processing comes back in the background of the invention section of the patent, where it says that on-the-fly processing is bad in a television broadcast context where you need to rapidly recall images. I don't want to let you run out of time before I ask you about Claim 12. I'm sort of confused as to what your theory is about Claim 12 and how it's consistent with the district court's interpretation. It seems to me that there are a number of different ways that it may be consistent. One would be to say with Claim 12, we're assuming that the data is being generated digitally from the external source and that it's being generated without some coding. Another possibility is that the analog-to-digital conversion and the unencoding takes place at the source. That seems to me very hard to read at that part of the specification. And then a third possibility would be that when there's concern about processing, but it doesn't extend to analog-to-digital processing or unencoded, and that's when it says set data, it doesn't mean set data without the process for analog-to-digital to be unencoded. What's your interpretation of Claim 12 that makes it consistent? You don't really address the coding issue in the group. Well, I think there are three responses to that, Your Honor. The first, as Judge Moore has suggested, is that there is not a road rule that every claim has to cover the preferred environment. It certainly is the preferred, but there's not a rule that every claim has to cover the preferred environment. But the second piece, as your question, I think, correctly indicated, is that Ampex's argument assumes that the data coming from the external source cannot be digital. And that is incorrect for two reasons. One, if you look at A114. So what's your answer? Yes. Claim 12 has to produce digital data from the external source. And there are two ways why. Correct. There are two reasons for that. One is the specification specifically refers to this invention receiving data from another electronic still store, which would be digital data. Number two is Claim 5. When the inventor, when the invention is specifically receiving data, when the system is receiving information that's analog, as it is in Claim 5 explicitly, the claim recites an A to D converter. If you look at Claim 5 on A116, it specifically refers to an analog to digital converter. The Claim 12, which does not recite an analog to digital converter, must already be digital data. Otherwise, you can't store that data. I would assume that all other than Claim 5 are assuming that their data is originally digital. Well, one of the reasons that's true is because you can only store data on a random access memory or on a disk store in digital form. And if you look at Claim 12 versus Claim 5, when the patentee was describing analog data, he specifically included an A to D converter. At the time, there were some cameras that produced analog data. The Kodak cameras start with what's initially captured. At the time, how did they use the cameras that the patenters mentioned? At the time this application was filed, the cameras produced analog data in general, right? Well, the source for the electronic still store system described in the patent was not necessarily analog. And that's why it indicates in the specification that it can receive digital data from another electronic still store system. I think you're correct that the television cameras at the time generally produced an analog signal that would then need to be converted to digital to be received by this system. But I think that's the answer to that question. If I could, in my final time, I'd just like to address two points. One that Mr. Jenner raised about whether or not the claim was narrowing. In fact, the Festo case, 535 U.S. 734, says that if you go ahead and amend a claim and forego your right to argue that it's presumed to be a concession that it's narrower, the amended claim is narrower than the original claim. And Mr. Jenner referenced the Bose case. The Bose case makes our point. In the Bose case, the original claim term included ellipse and they added a major diameter. The reason that was considered inherent is because mathematically an ellipse inherently has a major diameter. Here, data is not inherently processed or unprocessed. So it was a narrowing amendment. One final point. This, in our view, is not the close call that Ampex suggests. It's not a case where a single pixel changes and you're left with similar data and a similar image. The purpose of the electronic still store, even according to Ampex's experts, is to input the same data and output the same data. The heart of the Kodak accused cameras is the processing. Processing's purpose is to change every single pixel. And that's what they do. If you have a six megapixel camera, you start with six million pieces of data. After the first processing step, you've got 18 million new pieces of data. And then the original six million is thrown out. In fact, as a result of this processing, the data, the picture that's actually stored in the camera's card, has a different resolution than the picture that was initially captured and stored in random access memory. The claims of the 121 patent make it clear that a different resolution causes or creates different images. It talks about a full-size image and a reduced-size image. In the Kodak cameras, the CFA image, the initial image, is larger and has a different resolution by, in some cases, as many as four million pixels than what is ultimately stored in the camera's card. As a result, the data, all of the data stored in the card of the cameras, is always different from what was initially captured and stored in random access memory of the cameras. Thank you. A few points, Your Honor. I'd like to start with one of the last things that counsel said, which really shouldn't get lost here. He says the purpose is to input and output the same data in the 121 patent invention. That's not the purpose of the invention at all. The purpose of the invention is to create and store thumbnail, reduced-size images, along with full-size images, to create the rapid retrieval matrix of thumbnails that didn't exist in the prior art. And that's getting lost because that's what the goal is. And doing that doesn't turn on where along the chain you do any processing. At the time, you processed in the camera because that's what was known. Later, you can process between the RAM and the memory because miniaturization has made it possible to do that. But creating and storing thumbnails doesn't turn on whether and where you do processing. In the preferred embodiment, no. But my point is it does talk about processing where it does not change the image. And that shows you that beyond the preferred embodiment, by doing chrominance subsampling as one technique, you can get rid of it. You can change the pixel values. It doesn't change the image. So for counsel to say that's the only thing the court should look at is tantamount to arguing that you should limit this to the preferred embodiment. The preferred embodiment does show no processing between RAM and memory. It's plainly not the only way to do it because you can do the chrominance subsampling as well as other upstream processing anywhere you want to. It doesn't affect creating thumbnails. That's why they've used the invention here. In terms of Claim 12, the answer doesn't make sense. The input to Claim 12, if you're looking at the preferred— I'm still not sure what the answer to my question is. Is there any place in the specification where it contemplates this process occurring between RAM and memory? It does not. I would submit—it certainly doesn't say it. I would submit the patent contemplates that processing can be done anywhere. It doesn't matter to creating thumbnails and storing them. So insofar as Claim 12's relation to the preferred embodiment, all you have to do is look at the figure on page A113 of the appendix. It tells you you've got video input to an input A to D converter. So when counsel says the input can be digital, that's impossible. You can't have a digital input to the A to D converter. It's got to be analog. It's either a video camera, which is analog, or it's an analog still story. It can't be a digital input, and that's the problem with applying the court's reasoning to Claim 12. It's got to be an analog input. As far as the discussion of Claim 11 is concerned, I call Your Honor's attention again to A11670 in the appendix, where it shows the original language. The original language includes video pixel data comprising a full-size image. That's there already for the RAM, and it also says storing both the full-size and reduced-size image in storage. So the full-size image is already in RAM. The full-size image is already being stored in memory before any amendments get made. So that relationship was there, and the key relationship that the court swept into said data was not amended. Claim 11 should not be viewed the same way because it wasn't really amended where the court looked at it, and because per Glaxo, it's different language. It is not the same thing. All right. Thank you, Your Honor.